In re KENNEDY'S ESTATE.

1. WILLS—EVIDENCE—DECLARATIONS OF DECEASED — PAROL EVIDENCE RULE.
    A will executed by the testator in due form and properly witnessed, may not be shown to be inoperative by testimony as to declarations of the deceased that he did not intend it to be a final disposition of his estate.

2. SAME—PUBLICATION.
    No publication of a will is required to give it effect in Michigan.

3. SAME—REVOCATION.
    Placing the will out of the possession of the testator does not place it beyond his control to revoke by another instrument.

4. SAME—SUBSCRIBING WITNESSES—STATUTORY REQUIREMENTS.
    The mere failure of a subscribing witness to remember whether or not the will was subscribed by him in the presence of the other witness does not raise a question of fact for the jury, where he states that he has no recollection at all about the transaction, but that the signature is genuine.

5. SAME—UNDUE INFLUENCE—DECLARATION OF TESTATOR.
    Statements made by the testator that he was being hounded to make the will are inadmissible to prove undue influence.

Error to St. Clair; Law, J. Submitted November 18, 1909. (Docket No. 25.) Decided February 3, 1910.

Lawrence O'Neil, administrator, presented for probate the last will and testament of Thomas Kennedy, deceased. The will was allowed in the probate court, and James J. Kennedy and others appealed to the circuit court. A judgment for proponent on a verdict directed by the court is reviewed by contestants on writ of error. Affirmed.

David Fitzgibbon and John B. McIlwain, for appellants.
Walsh & Walsh, for appellee.

BLAIR, J. Thomas Kennedy died in the spring of 1908. In 1897 he signed a paper in the form of a will. The paper was drawn by John L. Black, and he and his nephew, Clare R. Black, are the witnesses. This paper was allowed in the probate court as the last will and testament of Thomas Kennedy. An appeal was taken to the circuit court by the brothers of deceased. The case rested on the testimony of the two subscribing witnesses, whereupon the circuit judge directed a verdict sustaining the document as the last will and testament of Thomas Kennedy, deceased. The contestants, his brothers, appeal and contest on the ground that the paper was not executed to operate as a will and not executed as required by the statute.

John L. Black testified that he was an attorney at law, and, up to January 1, 1897, had been judge of probate; that he drew the will in question, February 11, 1897; that, at Mr. Kennedy's request, he locked the door so that they should not be interrupted.

"I remember that will being signed by Thomas Kennedy. I saw him sign it.

"*Q*. In the presence of yourself and Clare R. Black?

"*A*. I cannot remember about Clare, but I remember myself; I did not know Clare was a witness to it until I saw it here in probate court. As a matter of memory I could not recall who it was that signed it besides myself. He writes a little different but have no doubt but that is his signature. I recall that Thomas Kennedy signed the will in my presence and that I signed it in his presence, at his request. I was well acquainted with Mr. Kennedy. He was in good bodily and mental condition at the time he signed it; no question about it in my mind.
\* \* \*

"*Q*. Just state to the jury what he said he wanted.

"*A*. Why, he wanted some paper; he was having trouble out there with the boys, as he put it, and they were making him a good deal of trouble and insisting upon knowing what he was going to do with his personal property, and I think at the same time he told me that he had already disposed of his real estate; that is the way I un-

derstood him, and he said they kept at him and kept hounding him all the time and that he wanted me to draw some kind of a paper that would be a peacemaker, that he could take out home. I told him at that time, 'Mr. Kennedy, you don't have to make any kind of a paper, you are too old a man to make any kind of a paper,' and he said to me, as I remember it, 'You don't know the conditions out there as well as I do,' and we talked it over one way and another. First we talked about a bill of sale, and I told him, if I remember right, some kind of a paper he had in mind that it was going to be a dangerous paper, and then he talked about putting it in the form of a will. I said that would be better because 'You can destroy it any time.' So I drew him up a paper, the paper that is here, and he signed it. * * * He said it was not a will; that at some future time he would draw a will.

"Q. Did you have any talk at that time with him about keeping it in your safe?

"A. Yes, I insisted, I said, 'Mr. Kennedy, leave that with me, don't take it out there; and if you don't want it, why, if anything should happen you, I could destroy it for you,' but he said, 'No; he would have to take it out there as a peacemaker.' * * * He went over pretty near the history of his life with me because I was at him for being so foolish as to sign a paper that he didn't want to sign. * * *

"Q. He told you he had made some disposition of his real estate at that time? * * *

"A. Well, he told me in a general way that he had made a disposition and that he wanted that put in the will that he had made a disposition of his real estate, in that paper there that he had made a disposition of his real estate during his lifetime.

"Q. And you put that clause in here?

"A. I put that clause in."

That the ink of Clare R. Black's signature was of a lighter hue than that used by Mr. Kennedy and himself; that he did not sign the paper as an instrument intended to become operative as a will, and, so far as he knew, neither did Clare R. Black; that from the time he drew the paper until the time Mr. Kennedy left the building with it he was constantly with him; that Clare R. Black might have signed the will as a witness in the presence of Mr.

Kennedy and himself and he might have taken the will into Clare R. Black's office and he have signed there.

"*Q.* But you told me a minute ago that the will and yourself—that you were with the will all the time until the old man took it away that day?

"*A.* Yes, sir.

"*Q.* For you do not remember taking it away from the old man in next door?

"*A.* No, I do not; and I don't remember of Clare coming in there either."

Clare R. Black, a practicing attorney, testified to the genuineness of his signature:

"*Q.* Now, Mr. Black, you state now that you have no memory of ever being called upon to witness any other will, except that one of Mr. Atkinson's prior to your becoming a member of the bar?

"*A.* No, sir.

"*Q.* If you had been called into the office of John L. Black and it had been made known to you either by Mr. Black or by Mr. Kennedy that Mr. Kennedy was making his will and he had signed it or was going to sign it and wanted you and Mr. Black to witness it or wanted you to join with Mr. Black to witness it, and you did so join with him in witnessing it; what do you say whether you would have remembered it?

"*A.* I believe I would have.

"*Q.* What do you say now as to whether any such transaction as that occurred in February, 1897, in connection with the execution of the document presented here as a will?

"*A.* As to whether I went in there and Mr. Kennedy asked me to sign this as his witness and told me what it was?

"*Q.* That he was making a will and wanted you to sign as a witness, or Mr. Black in his presence and you did sign as a witness to his making his will; what do you say as to whether any such transaction as that occurred?

"*A.* Well, from memory I would say, ' No.' "

The court directed a verdict for the proponents, instructing them that the will had been executed in pursuance of the formal requirements of the statute and that parol testimony that the testator did not intend that the instrument should operate as a will was not receivable.

"The presumption is that this paper was executed, subscribed and attested or witnessed as it purports to be on its face, and the mere fact that Mr. Black, one of the witnesses, fails to remember the circumstances under which he subscribed and attested this will, cannot under the law of this State be allowed to defeat it.

"The court instructs you that these statutory formalities of execution have been complied with in this case as shown by the evidence. That is, the paper claimed to be a will is in writing, it is signed by Mr. Thomas Kennedy, it was attested and subscribed in the presence of the testator by two or more competent witnesses, hence you must assume that the paper here claimed to be a will, was executed in the form and manner as prescribed by law.

"The contestant also claims as heretofore stated, that Mr. Kennedy at the time he executed this paper did not intend to make a will, but signed the paper merely to satisfy his relatives, the family of John Cavanaugh, Mr. Cavanaugh being the beneficiary under the will, and this being the family with whom Mr. Kennedy was living. Mr. John L. Black testifies that Mr. Kennedy said to him just before the paper was prepared, signed and witnessed, that he, Mr. Kennedy, did not intend the paper for a will, but merely to satisfy the sons of John Cavanaugh who were hounding him about his property. The court says to you that this testimony cannot be received and considered to invalidate the paper and render it of no effect as a will. Parol testimony of this kind when it arises, separate and apart from any question of fraud, undue influence, mental competency or of ambiguity in the paper proposed as a will, cannot be permitted to overcome the presumption that the testator in executing a solemn instrument like a will, intended the paper not for a will but to serve some collateral and extraneous purpose. To admit such testimony to defeat a will in a case like this would to some extent tend to defeat the right which every sane and competent person has under our laws to make a final disposition of his property by will and to have his or her wishes in regard to property carried out after death. The momentous consequence of permitting parol evidence to thus outweigh the sanction of a solemn act is obvious. It would have a tendency to place all wills at the mercy of a parol story that the testator did not mean what he said and what he put in solemn written form. Hence, gentlemen of the jury, it is the duty of the court in this case to direct a verdict in favor of the proponent of the will."

The will gave all of his personal property to his sister's husband, John Cavanaugh. The important question presented by this record is, whether the court erred in holding, as a matter of law, that evidence was not admissible to show that the alleged will was executed for a collateral purpose and that the testator did not intend it to operate as a will disposing of his property. Stated in another way, the question is: Is an instrument purporting to be a will and executed with all the statutory formalities conclusively presumed to have been executed *animo testandi?* This question is one of first impression in this court. As stated by the circuit judge, the question is wholly separate and apart from any question of fraud, undue influence, or mental competency in the procurement of the will or of ambiguity in the meaning of its provisions. The evidence conclusively shows that the testator was of sound mind, was laboring under no mistake of fact, knew precisely what he was doing, and intended to do precisely what he did do, viz.: to execute, according to the forms prescribed, a paper on its face disposing of his estate, with knowledge that he could revoke it at any time. Accepting the testimony of the scrivener, it must be presumed that he exhibited the will to his brother-in-law as his genuine will for the purpose of securing peace in the family and securing those attentions which he required.

"*Q.* You understood from him that he was making his home at the Cavanaughs'?

"*A.* I did; yes. Mrs. John Cavanaugh was his sister.

"*Q.* What reason did he give for making his home there?

"*A.* If I remember right, that his father and brothers were keeping bachelor's hall or something of that kind and it was handy for him over there; that he could get his clothes cared for and one thing and another with his sister, and he made his home there and lived with them. I don't know how long he had been living there, but if I remember right, he told me that he taught school out in Emmett, too, and had made his home there while he was teaching school. Then he came in here and remained a great many years when he was here as deputy county

treasurer. He made his home then at Mr. Walsh's hotel. He had either left the county treasurer's office or was about going to leave, I don't remember just which, and he was going back to make his home with the Cavanaughs or had made it when this trouble arose out there whatever it was, he wouldn't tell me the details of it.

"*Q*. So that just before this will had been made he was here to town for eight years?

"*A*. For eight to twelve, somewhere along there."

The testimony of the scrivener also discloses that Mr. Kennedy intended at a future time to make a will, but never spoke to him again about the paper in question or the making of another will. For over 11 years Mr. Kennedy retained this will in his possession, so far as this record discloses, and died leaving it unrevoked. There can be no doubt that a presumption of testamentary intention arises from the deliberate execution, by a competent person, of a paper in the express form of a will in strict pursuance of the provisions of our statute regulating the execution of wills. Whether this presumption is a disputable one is the serious question in this case.

Respectable authorities are cited by counsel for contestants, some of which are directly in point, holding that parol evidence is receivable in such cases. The case of *Lister* v. *Smith*, 3 S. & T. 282, is such a case. In that case, the question was whether a certain codicil was entitled to probate. It was regularly executed by the testator, but evidence was given at the trial that the testator never intended it seriously to operate as a testamentary document. It was proved before the jury that the testator wished one of the family to give up a house which she then occupied and that, to force her to do so, he made pretense of revoking by codicil a bequest which he had made by will in favor of this woman's daughter, and that the paper in question was made with that sole object; that the testator gave his attorney instructions to prepare it with that intention and informed him before it was drawn that he never wished it to operate at all; further, that the attorney pointed out the folly of executing such an in-

strument and would have nothing to do with its execution.
It was, however, executed in the presence of the testator's
brother, to whom it was then given by the testator with
express directions that he was not to part with it and that
it was in no event to operate or to revoke the bequest
made in his will, but to be used only in the manner above
described.     Similar declarations were made by the testa-
tor at the moment of its execution.     The court said:

   "The momentous consequences of permitting parol evi-
dence thus to outweigh the sanction of a solemn act are
obvious.     It has a tendency to place all wills at the mercy
of a parol story that the testator did not mean what he
said.     On the other hand, if the fact is plainly and con-
clusively made out, that the paper which appears to be
the record of a testamentary act, was in reality the off-
spring of a jest, or the result of a contrivance to effect
some collateral object, and never seriously intended as a
disposition of property, it is not reasonable that the court
should turn it into an effective instrument.     And such no
doubt is the law.     There must be the *animus testandi;*"
citing *Nichols* v. *Nichols,* 2 Phille. 180; *Trevelyan* v.
*Trevelyan,* 1 Phille. 149; Swinb. pt. 1, s. 3; Shep. Touch.
404; *Pym* v. *Campbell,* 6 El. & Bl. 370.

   The court, however, recognizing the serious conse-
quences which might flow from this holding, remarked:

   "But here I must remark that the court ought not, I
think, to permit the fact to be taken as established, unless
the evidence is very cogent and conclusive.     It is a mis-
fortune attending the determination of fact by a jury, that
their verdict recognizes and expresses no degree of clear-
ness in proof.     They are sworn to find one way or the
other, and they do so sometimes on proof amounting al-
most to demonstration, at others on a mere balance of tes-
timony; sometimes upon written admissions and inde-
pendent facts proved by disinterested parties, sometimes
on conflicting oaths or a nice preponderance of credibility.
And it is difficult to impress them with the enormous
weight which attaches to the document itself as evidence
of the *animus* with which it was made.     This weight it
becomes the court to appreciate, and to guard with jeal-
ousy the sanction of a solemn act.     In the present case,
however, the court finds the evidence so cogent, that it is

prepared to act on the finding of the jury that the codicil was executed as a sham and a pretense, never seriously intended as a paper of testamentary operation. But I am far from saying that the court will in all cases repudiate a testamentary paper simply because a jury can be induced to find that it was not intended to operate as such. The character and nature of the evidence must be considered, as well as the result at which a jury have arrived, and the court must be satisfied that it is sufficiently cogent to its end."

The case of *Swett* v. *Boardman*, 1 Mass. 262 (2 Am. Dec. 16), cited by counsel for contestants, is to the effect that some form of publication of a will is necessary, and that it was competent to prove by parol that at the time of executing the instrument proposed as his last will and testament the testator did not know or suppose that he was executing a will. The case of *Waite* v. *Frisbie*, 45 Minn. 361 (47 N. W. 1069), also cited by counsel for contestants, merely holds that where a will is not read by nor to the testator and it has been prepared by another person from instructions given by the testator and is then signed upon an assurance that it expresses what he desires, if the language inserted is not the language of the instructions, and if it does not make in legal effect the provisions which the testator apparently desires, it is not his will.

See, also, 30 Am. & Eng. Enc. Law (2d Ed.), p. 581, and cases cited; 1 Underhill on Wills, § 39.

" The momentous consequences of permitting parol evidence thus to outweigh the sanction of a solemn act," referred to by the court in the case of *Lister* v. *Smith*, *supra*, are still more momentous under the laws of this State, since, under the rule of evidence prevailing with us, no more cogent evidence is required to establish the fact of lack of testamentary intention in the making of an instrument than to establish any other fact which may be submitted to a jury for its determination, and the court has no greater authority to control the verdict or influence it in such a case than in any other. Recognizing fully the high character of the authorities sustaining the con-

testants' position, we are inclined, as this is an open question in this State, in view of the serious consequences of the contrary view, to hold, as was held by the supreme court of Alabama in the case of *Barnewall* v. *Murrell*, 108 Ala. 366 (18 South. 831), that:

"It was, doubtless, one of the purposes of the statute, in requiring that testamentary dispositions of personal property should be executed with the same formalities required in devises of land, to remove them from the doubt and uncertainty in this respect which attended them while the rule of the common law prevailed. There is no other mode of giving a valid expression to the *animus testandi*, than that which the statute prescribes. Whatever forms the expression may assume, whatever solemnity may accompany it, the statute declares it ineffectual, unless the formalities it prescribes are observed. When these formalities are observed, if the writing be testamentary, if it imports a posthumous destination of property, the statute in itself and of itself attaches, and conclusively attaches, the *animus testandi*. The requisition of extrinsic or additional evidence of its existence is to add to the requirements of the statute; and to receive such evidence to repel the existence of the intent would be to receive evidence against the statute."

And, again:

"When a sane testator, not subject to coercion or restraint, intentionally executes, with the formalities required by the statute, a writing which in form and substance is testamentary, the writing of itself imports, and conclusively imports, the *animus testandi*, *i. e.*, the mind to dispose, the firm and advised determination to make a testament, closing all inquiry as to the existence and manifestation of the intent."

Section 9262, 3 Comp. Laws, provides for the disposition of real property by will. Section 9265, 3 Comp. Laws, provides that every person of full age and sound mind may by his last will and testament in writing bequeath and dispose of all his personal estate. Section 9266, 3 Comp. Laws, provides that no will—

"Shall be effectual to pass any estate, whether real or

personal, nor to charge or in any way affect the same, unless it be in writing, and signed by the testator, or by some person in his presence, and by his express direction, and attested and subscribed in the presence of the testator by two or more competent witnesses;" etc.

Section 9270 provides:

"No will nor any part thereof shall be revoked, unless by burning, tearing, canceling, or obliterating the same, with the intention of revoking it, by the testator, or by some person in his presence and by his direction; or by some other will or codicil in writing, executed as prescribed in this chapter; or by some other writing, signed, attested and subscribed in the manner provided in this chapter for the execution of a will; excepting only that nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the testator."

No publication of the instrument is required in this State to give it effect, but the execution of an instrument in testamentary form with the statutory formalities completes the testamentary act. *Danley* v. *Jefferson*, 150 Mich. 590 (114 N. W. 470).

The execution of a paper in the form of a will under the provisions of our statute does not place the instrument beyond the control of the testator, whether he retains possession of it himself or delivers it over to the persons for whose benefit it has been made or to another person for them. It remains at all times subject to his control. If he retains possession of it, he may revoke it in one of the ways specified in the statute. If he has parted with the possession of the instrument, he may revoke it by making a will. The certificate of attestation is as follows:

"On this 11th day of February in the year one thousand eight hundred and ninety-seven, Thomas Kennedy of the township of Emmet, St. Clair county, Michigan, signed the foregoing instrument and declared the same to be his last will and testament in the presence of us as witnesses and we not being interested therein at the request of said Thomas Kennedy, in his presence and the presence of each other, and where he could see us sign our names,

did thereupon on said above mentioned day, subscribe our names thereto as witnesses thereto.

> "CLARE R. BLACK,
> "Residing at Port Huron, Mich.
> "JOHN L. BLACK,
> "Residing at Port Huron, Mich."

On the back of it, in the handwriting of Mr. Black, was: "Will of Thomas Kennedy, of Emmett, St. Clair county, Michigan." It is undisputed that John L. Black witnessed the instrument in the presence of the testator. Clare R. Black testified:

"*Q.* Do you recall the circumstance of signing that?

"*A.* No, sir.

"*Q.* You haven't any present memory of going into that office? You haven't any present memory of signing that paper at all?

"*A.* No, sir. \* \* \*

"*Q.* But you have no memory one way or the other on this paper now at this time?

"*A.* No, sir."

It is apparent from his testimony that he had no recollection whatever of the facts connected with his signing the will as a witness. His opinion, based wholly upon conjecture, is not sufficient to raise a question of fact for the jury, and the trial court did not err in so holding. *Abbott* v. *Abbott,* 41 Mich. 542 (2 N. W. 810). The declarations of the testator that he was being hounded to make a will are the sole evidence in the record of undue influence in the procuring of the will, of which fact they are not competent evidence. *Zibble* v. *Zibble,* 131 Mich. 655 (92 N. W. 348).

The judgment is affirmed.

HOOKER, MOORE, McALVAY, and BROOKE, JJ., concurred.